## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TRANSITO TRUJILLO,

     Plaintiff,

vs.                                                                      No. CIV 03-1185 JB/LFG

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS;
MARK MAYERSTEIN, Senior ROTC
Instructor, and ANTHONY GRIEGO,
Valley High School Principal, in their
official and Individual capacities,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendant Board of Education of the
Albuquerque Public Schools' ("APS") Motion to Dismiss or for Summary Judgment, filed October
13, 2005 (Doc. 49); and (ii) Plaintiff Transito Trujillo's Motion for Summary Judgment Against APS
Defendants, filed October 19, 2005 (Doc. 53). The primary issues are: (i) whether there is a genuine
issue of material fact that APS wrongfully terminated Trujillo's employment; and (ii) whether there
is a genuine issue of material fact on Trujillo's claim for retaliation in violation of Title VII, that APS
caused his military decertification to teach in the Air Force Junior ROTC ("AFJROTC") programs.
Because neither party has established the right to summary judgment, both motions will be denied.

## FACTUAL BACKGROUND

The Court has set forth many of the relevant undisputed background facts in several written
opinions. See, e.g., Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d 997,
983-84 (D.N.M. 2004)(Browning, J.); Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377

F. Supp. 2d 994, 1000-05 (D.N.M. 2004)(Browning, J.); Trujillo v. Bd. of Educ. of the Albuquerque

Pub. Schs., 377 F. Supp. 2d 1020, 1025-29 (D.N.M. 2004)(Browning, J.).  The Court will set forth

additional undisputed facts as presented in the parties' current motions for summary judgment.

> [T]he Albuquerque Public Schools ("APS") hired Trujillo at Valley High School
> ("VHS") as Aerospace Science Instructor ("ASI") in the Air Force Junior ROTC
> ("AFJROTC") program. Trujillo held the position of ASI for eleven years.
>
> . . . .
>
> Trujillo's wife, Major Lourdes Trujillo, was also a qualified AFJROTC instructor.
> When a position for Senior ASI became available in the VHS AFJROTC program,
> Lourdes Trujillo applied for the position. APS hired Defendant Mark Mayerstein,
> rather than Lourdes Trujillo, to fill the position.

Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs, 377 F. Supp. 2d at 982 (citations to record

omitted).

The specific Senior ASI ("SASI") position at VHS included a duty to teach an honors

"Private Pilot's Ground School" class that required the instructor to be "both Private Pilot Ground

School and FAA Instructor certified."  Plaintiff's Response to Defendants' Motion for Summary

Judgment, filed October 27, 2005 ("Plaintiff's Response")(Doc. 56), Exhibit 9, ¶ 9.  It is undisputed

that Lourdes did not have these qualifications.  Nevertheless,

> Lourdes . . . filed an Equal Employment Opportunity Commission ("EEOC")
> complaint on June 1, 2001, alleging discrimination based on national origin and sex.
> Trujillo contends that Lourdes' EEOC charge was "generally known"-- and known
> to the individual defendants to this lawsuit -- in December 2001.
>
> Trujillo alleges that he openly supported Lourdes in the EEOC process and
> as she prepared to litigate the issue.

Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d at 1026 (citations to record

omitted).

As it turned out, although he represented to APS that he would be FAA certified to teach the honors class before he began teaching, Mayerstein did not complete his FAA certification before he took over the honors class in October 2001.  Trujillo discovered this fact in November 2001.

> According to Trujillo, he asked Mayerstein if he was FAA certified, Mayerstein replied that he was not.  He then "reported Mayerstein to [Anthony] Griego," VHS' principal, because "Mayerstein did not comply with Air Force mandated requirements."  On December 10, 2001, Lourdes wrote a letter to the Board of Education asserting that Mayerstein was teaching the ROTC Private Pilot Ground School course without the proper certification.

Id. at 1027 (citations to record and footnotes omitted).  "Beginning in November 2001, Mayerstein reported to the VHS administration that Trujillo was not working his scheduled hours and rarely came to class prepared to teach. . . . Trujillo maintains that Mayerstein's allegations about his work performance are untrue."  Id. at 1028.  The tension and disagreement between Mayerstein and Trujillo became extreme.

On March 20, 2002, Mayerstein, who, under the AFJROTC regulations, was Trujillo's supervisor, formally counseled Trujillo about not being at work the requisite number of hours, not using a "planned and cohesive curriculum," not properly ordering uniforms and supplies, and not participating in progress reporting, and he informed the national AFJROTC headquarters of the problems.  See Defendants' Response to Motion for Summary Judgment, filed November 1, 2005 ("Defendants' Response")(Doc. 57), Exhibit A; Plaintiff's Reply to Defendants' Response to Motion for Summary Judgment ("Plaintiff's Reply"), filed November 16, 2005 (Doc. 61), Exhibit 3.  On April 3, Mayerstein gave Trujillo a "Minimum Tasking" document during another formal counseling session, contending that Trujillo had refused "to accept" the March 20 counseling.  Defendants' Response, Exhibit B.  The tasking document was "coordinated with, and approved by, HQ

AFROTC/JRI and Mr. Griego." Id.  The tasking document instructed Trujillo to "cease and desist immediately in your practice of involving students in any disputes between us." Id. at 3.  Trujillo refused to sign a "Record of Counseling," stopped the proceedings, and asked for a lawyer.  See id. at 1.  That same day, Trujillo filed a charge of discrimination/retaliation with the EEOC, asserting that Mayerstein, Griego, and APS were retaliating against him because of his support of Lourdes' EEOC complaint.  See Plaintiff's Motion for Summary Judgment, filed October 19, 2005, Exhibit 7.

On April 4, Trujillo sent Griego a memorandum asserting that Mayerstein, "in a vindictive, immature nature, is withholding information that I need to do my job."  Defendants' Motion for Summary Judgment, filed October 13, 2005 (Doc. 50), Exhibit C at 1.  On April 7, Trujillo prepared a lengthy rebuttal to his April 3 counseling, alleging that Mayerstein's statements were "complete fabrications." Id. at 2.  Trujillo also asserted that the military "has no jurisdiction over" him or Mayerstein and had no say in Griego's decision to hire or fire him, as long as Trujillo was qualified for a ROTC position. Id.  Trujillo complained that Griego had "no idea what is going on in [his] ROTC unit" and asked him to "[t]alk to the students." Id.  Trujillo stated that, to allow Mayerstein to remain in his position as SASI was to "condone his abusive behavior," and warned that he would "seek every legal opportunity" at his disposal "to have the current arrangement resolved." Id. at 7.

That same weekend, VHS parents of ROTC students staged a demonstration, which the media covered, to complain about Mayerstein. Mayerstein asserted that it was "orchestrated by. . . Trujillo's supporters." Plaintiff's Motion for Summary Judgment, Exhibit 8.

> While Trujillo asserts that he did not organize the demonstrations, apparently parents demonstrated in front of the school -- and on the evening news -- against what they perceived was happening in the AFJROTC program and specifically against Mayerstein's abusive behavior to the students.  Students and parents began to take sides between Mayerstein and Trujillo.  All parties agree that a hostile educational

environment existed at VHS in the spring of 2002.

Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d at 992.

On April 8, 2002, many parents also came to the APS Service Center to complain about Mayerstein.  See Plaintiff's Motion for Summary Judgment, Exhibit 18. As a result, Griego responded that he had "contacted the military who will conduct their own investigation."  Id.  On April 11, another parent called the APS Service Center to complain that she experienced a "confrontation" with Trujillo.  Id., Exhibit 20.  She said that she and 12 other concerned parents did not "care what action Mr. Griego takes.  They just don't want the ROTC program to end."  Id.

VHS's assistant principal Bruce Smith sent Trujillo a "Letter of Understanding" on April 11. Defendants' Response, Exhibit E.  The letter stated that Trujillo's refusal to continue the April 3 counseling proceeding was "insubordinate" because he should know he was bound by the rules and procedures set forth by his AFJROTC military command as well as by APS' rules.  Id.  Smith noted that he had tried to reach Trujillo several times and found him to be off campus, and that Trujillo should not be off campus during school hours without signing out.  See id.  He noted that Trujillo had been told at the April 3 meeting not to involve others in his disagreements with Mayerstein but that Trujillo was "soliciting other staff to be involved."  Id.  He stated that the "administration will interview and investigate as they see fit," and that Trujillo should "[s]top this practice at once."  Id. Smith warned Trujillo that "[t]he problems in the ROTC program have spread to a point where the total program is in jeopardy.  The students and parents are divided, and support for the program is failing.  Both parties are to stop their actions.  This has been conveyed to you at a meeting and now in writing."  Id.

Smith apparently did not copy the memorandum of understanding to the national AFJROTC

5

headquarters, however.  See id.  Griego contacted APS' Office of Equal Opportunity Services ("OEOS"), requesting an investigation and stating that Mayerstein's and Trujillo's conduct "was adversely impacting the students."  Plaintiff's Motion for Summary Judgment, Exhibit 11 at 1.

On April 15, 2002, Mayerstein gave Trujillo an unsatisfactory rating on his annual ROTC evaluation.  See id., Exhibit 9.  According to AFJROTC regulations, school principals are considered the program directors of the ROTC programs at the school level, and his/her "evaluation or indorsement can initiate action which could result in AFJROTC instructor decertification action." Id., Exhibit 13, ¶ 3.2.  Bases for decertification include:  being overfat; engaging in an incident of willful misconduct; fraudulently certifying information in an instructor application; engaging in conduct "that does not meet the standards expected of an Air Force officer;" engaging in "conduct causing discredit or embarrassment to the Air Force or the AFJROTC program;" or receiving an unappealed-from overall evaluation of "unsatisfactory" indorsed by the principal. Id. ¶¶ 2.2.6-2.2.6.4.

Instead of concurring in Mayerstein's unsatisfactory rating of Trujillo, however, Griego voided the comments that Mayerstein had attributed to him and did not indorse the evaluation.  See Plaintiff's Response, Exhibit 13.  On April 17, Griego prepared a satisfactory teacher's evaluation for Trujillo, see id., Exhibit 16; recommended his re-employment, see id.; and attached a memorandum to Mayerstein's ROTC evaluation of Trujillo stating that Trujillo and Mayerstein had a "personality conflict . . . that has led to the rating," Defendants' Response, Exhibit J.

On April 18, 2002, the APS Service Center received yet another parent's complaint that Mayerstein was "in a 'pissing' contest with Chief Trujillo."  Plaintiff's Motion for Summary Judgment, Exhibit 22.  Griego stated  he would meet with parents to address their concerns.  See id. On April 19, Smith gave Mayerstein a formal letter of reprimand for dealing with parents and students

in a "negative and demeaning manner." Defendants' Response, Exhibit D. He noted that the ROTC program was "highly divided . . . [which was] easily documented by the volume and content of the calls being received from parents." Id. Smith sent a copy of the letter of reprimand to JoAlice Talley, the national certification officer of the AFJROTC. See id.

On April 22, 2002, Barbara Lynn, the Director of OEOS, recommended that both Mayerstein and Trujillo be placed on paid administrative leave for the remainder of the school year pending an investigation into whether the conduct between them had "lead to a hostile educational environment for the students." Plaintiff's Reply, Exhibit 7.

Griego gave Trujillo a copy of Mayerstein's ROTC evaluation on April 24, 2002, and Trujillo requested that it be "voided" as "false and vindictive." Plaintiff's Response, Exhibit 13 at 2. On April 29, 2002, APS notified Trujillo that he had been re-employed for the following year, see Plaintiff's Reply, Exhibit 8, but that same day Ronald Williams, APS' Director of Certified Staffing, notified Trujillo and Mayerstein that both of them had been placed on paid administrative leave, "pending an investigation of allegations that you have created a hostile educational environment at [VHS]," Defendants' Motion for Summary Judgment, Exhibit B-1, B-2. On May 24, 2002, the APS OEOS office conducted an "investigative meeting" with Trujillo, accompanied by his attorney. Plaintiff's Response, Exhibit 27.

Apparently in response to Trujillo's insistence that Griego needed to talk directly to the ROTC cadets to find out what was going on in the ROTC program, Lynn also interviewed VHS ROTC Cadet Officers, and prepared a written report on June 11. In her OEOS report, Lynn listed the following concerns and opinions she gathered from the ROTC cadets: there was "tension and inappropriate conduct" between Mayerstein and Trujillo that impacted the classroom and "at times

7

created a hostile environment;" Mayerstein used inappropriate language and had temper tantrums; Trujillo was not available to the students but did provide instruction related to the program; "both instructors had hindered their senior year;" "both instructors were not role models and acted as children;" and both instructors should be removed.  Plaintiff's Motion for Summary Judgment, Exhibit 11 at 2.  Lynn found that "the students were used as pawns between the AFJROTC instructors and parents," id., and that both men "were soliciting support from the students to assist in their own agenda for their positions with the District."  Id. at 3.

Lynn also listed her own concerns that Trujillo: refused to take direction from Mayerstein and did not follow AFJROTC rules; incited parents and contacted them to support his position; and limited his time at VHS.  See id.  She listed concerns about Mayerstein as well.  They included:  his use of profanity with students; demeaning, threatening, and belittling students in front of their peers; retaliating against students who exercised their right to seek assistance from the VHS administration; "informing the [VHS] administration and HQ AFOATS/JA and the Instructor Management Branch of Mr. Trujillo's poor job performance and then recanting his allegations of his competence;" and disregarding the AFJROTC curriculum and not ensuring it was accessible to all students.  Id.  She recommended that both instructors be terminated, but suggested that APS could consider placing Trujillo under "intensive evaluation" with warnings that inappropriate conduct could result in discipline and termination.  Id. at 4.

Trujillo filed a second EEOC complaint against APS, Griego, Mayerstein, and Susie Peck (APS' assistant superintendent) on June 28, 2002.  See Defendants' Motion for Summary Judgment, Exhibit A.  He alleged he had heard rumors that he might be terminated; that Mayerstein had rearranged his office; and that someone had been hired to replace him.  See id.  He complained that

Mayerstein was being allowed on the VHS campus, while he had been banned from campus.  See id.
He asserted that the actions were in reprisal for his EEOC complaint and for supporting his wife.  See
id.

On July 12, 2002, APS' attorney notified Trujillo's attorney that both Mayerstein and Trujillo
would be returned to their employment under "intensive evaluation."  Plaintiff's Response, Exhibit
14.  Upon hearing that Trujillo would be re-employed, Mayerstein wrote a letter to APS' acting
superintendent and copied it to the AFJROTC parent's council and to the national AFJROTC
headquarters.  He asserted that Trujillo's continued employment would "irreparably damage the
credibility of the AFJROTC program and the regulations."  Defendants' Motion for Summary
Judgment, Exhibit C-12.  He accused Trujillo of "blatantly" violating the values of "responsibility,
duty, leadership, and morality" the previous school year by:  working an average of only 15.67
hours/week for three quarters of the year; not teaching a "planned, cogent curriculum;" not fulfilling
his duties involving teaching, drill teams, uniforms, and accounts; disregarding ROTC and Faculty
rules; undermining Mayerstein's authority; and making "dates for lunch and after school hours with
a woman to whom he was not married and with whom, many firmly believe, he had a past sexual
history."  Id.  According to Mayerstein, continuing to employ Trujillo would send a message to
ROTC cadets, their parents, taxpayers, and APS employees that it was okay not to come to school;
that there were no consequences to not following the rules; and that "immorality, actual or perceived,
is not something about which to be concerned."  Id.  Mayerstein warned that employing Trujillo
would "drastically affect AFJROTC enrollment" and that Trujillo would "be the cause of extreme
tension in the unit."  Id.

Nevertheless, on August 2, Peck notified Trujillo that she had decided Trujillo would return

to teaching at VHS; that a military decertification process should be reviewed during the next school year; and that she had requested Griego to "follow procedures to address areas of concern via the evaluation process." Plaintiff's Motion for Summary Judgment, Exhibit 12. Accordingly, on August 8, 2002, Griego gave Trujillo another Memorandum of Understanding setting out how Trujillo was to conduct himself and what steps Griego would take to evaluate him. See Defendants' Response, Exhibit I. Mayerstein was similarly re-employed.

In the meantime, Michael Doyle, the national Deputy Director of the AFJROTC program who had been aware of the imbroglio since March, sent both ROTC instructors a letter on August 6, 2002, instructing them that neither should send correspondence to ROTC parents without his office's and Griego's prior approval and that there should be no discussion with parents about their personal conflicts and complaints because they had "polarized cadets and parents and negatively impacted the image and mission of the AFJROTC program." Defendants' Response, Exhibit G. Doyle warned Mayerstein and Trujillo that a "failure or refusal to follow these directives will result in immediate consideration for decertification." Id.

On August 15, 2002, Mayerstein wrote a memorandum stating that Trujillo had not reported to duty as Griego had instructed and that Trujillo had given the headquarters AFJROTC e-mail address to an organization called Libertad, which sent inflammatory e-mails to headquarters. Plaintiff's Response, Exhibit 20. He asserted that Trujillo was responsible for new news reports that accused Mayerstein of wrongdoing, and that Trujillo was complaining to cadets about changes Mayerstein had made. See id.

Doyle went to VHS to meet with administrators, Mayerstein, and Trujillo on August 20, 2002. At that time, Williams gave Doyle a copy of the June 11 OEOS report that Lynn had prepared.

See Plaintiff's Response, Exhibit 3a.  Trujillo informed Doyle that he "had filed EEOC charges against [Doyle] for implying on a letter of August 6, 2002, that [Trujillo] caused division among parents and ROTC students and was responsible for the disruption of the program, which is a lie." Id., Exhibit 19 at 4.  A group of ROTC parents, again accompanied by television reporters and the press, asked to present complaints about Mayerstein to Doyle, but he declined.  See Plaintiff's Reply, Exhibit 6.  In his August 21, 2002, report to the national AFJROTC Director, Doyle reported being "mobbed and surrounded" by the parents, and that they "pushed, pulled, kicked, and spat at" him. Id.

On August 23, 2002, the national AFJROTC Director notified Mayerstein and Trujillo that both of them had been decertified as ROTC instructors.  See Defendants' Motion for Summary Judgment, Exhibits G-1 & G-2.  Citing applicable AFJROTC regulations, the Director stated that their

> conduct has not met the standards expected of [] Air Force . . . Officer[s] and has caused discredit and embarrassment to the Air Force and AFJROTC program.  Your actions have directly contributed to a hostile work environment and have unfavorably represented the Air Force and AFJROTC to [VHS].

Id.  APS put Mayerstein and Trujillo on paid administrative leave on September 3, 2002, after receiving notification of their decertification, reminding them that they could not teach without a valid certificate to teach from the Air Force.  See id., Exhibit A-2 at 5.  APS gave them formal notice of termination on October 16, with an opportunity to appeal.  See id., Exhibits J-1, J-2.  The reason for the terminations was that their "certification to instruct an Air Force Junior ROTC program has been withdrawn."  Id.

Trujillo filed a third EEOC complaint against APS and its Superintendents on October 2,

11

2002, alleging that APS employees "engaged in a campaign to remove me based on false allegations and investigations" in reprisal for his Hispanic heritage, his EEOC complaints, his support of his wife, and for supporting VHS students who were abused by Mayerstein.  Defendants' Motion for Summary Judgment, Exhibit A-2.  Trujillo alleged that Mayerstein, Griego, Smith, Williams, Peck, and Superintendent "Joe Vigil, together with Air Force actors, engaged in a campaign to remove me based on false allegations and investigations."  Id.

## PROCEDURAL BACKGROUND.

Trujillo filed two federal complaints centered around substantially the same facts.  The Court consolidated the two cases for procedural efficiency.  The first complaint, 02cv1146, alleged retaliation by the individual APS Defendants in violation of Trujillo's First Amendment right to free speech and retaliation by APS and the individual defendants (acting in their official capacities) in violation of Title VII of the Civil Rights Act for actions taken *before* Trujillo was decertified and terminated.  The Court granted summary judgment in favor of all of the individual defendants *except for* Mayerstein on the First Amendment claims because Trujillo had "not presented evidence showing a constitutional violation, [and, therefore] the Defendants are entitled to qualified immunity."  Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d at 981 & n.1.        The Court later granted summary judgment to APS on Trujillo's claim that its agents, acting in their official capacities, retaliated against him for supporting his wife's EEOC complaint, reporting Mayerstein's abuses, and for filing his own EEOC complaint.  See Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d at 1024 & n. 3; id. at 1034.  The specific instances of adverse action Trujillo alleged against APS in his first complaint were placing "him on administrative leave with pay and . . . [sending] him a Letter of Understanding."  Id. at 1035.  The Court concluded that Trujillo had not

12

offered "sufficient evidence of an adverse action and of causal connection to establish a prima facie case of Title VII retaliation," and, even if he had, "APS has offered a legitimate, non-discriminatory reason for its action and Trujillo does not offer evidence to create a genuine issue of material fact that the reason is pretext." Id. at 1034. Thus, Mayerstein is the only Defendant remaining in Trujillo's first federal case.

Trujillo's second federal complaint, 03cv1185, alleged wrongful termination and retaliation against APS, Mayerstein, and Griego. See Amended Complaint at 1, filed October 12, 2003 (Doc. 4). It alleged that he was terminated "for participating in Title VII protected activities and because of his national origin, Hispanic." Id. Specifically, Count I alleged that the Defendants "set up Plaintiff for decertification by the Air Force so they would have pretext to terminate him, without just cause, by providing derogatory information to the Air Force." Id. at 14. In the pretrial report, Trujillo contended that "APS, thru [sic] its agents, employees, and representatives . . . Mayerstein, Griego, Williams and Peck intentionally furnished false negative information to the Air Force that had a likely effect on Plaintiff's future job opportunities as a certified AFJROTC instructor. Defendant caused Plaintiff's decertification in furtherance of its scheme to terminate him for his Title VII protected activities." Pretrial Report at 3, filed August 15, 2005 (Doc. 44). Thus the second federal complaint at bar deals only with Title VII retaliation based upon Trujillo's decertification and resultant termination.

## STANDARD FOR DECIDING SUMMARY JUDGMENT MOTIONS

As the Court has noted in resolving the parties' previous motions for summary judgment, the following standards apply:

Rule 56 of the Federal Rules of Civil Procedure allows a court to grant

13

summary judgment if a party is entitled to judgment as a matter of law and there are no genuine issues of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  To avoid summary judgment, the non-moving party must contradict facts that the movant specifically avers.  See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).  The court must deny a motion for summary judgment when a genuine issue of material fact remains to be tried, or where the moving party is not entitled to a judgment as a matter of law.  See Kennedy v. Silas Mason Co., 334 U.S. 249, 252 (1948).

The moving party bears the initial burden of establishing the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. at 323.  This burden can be met by the moving party by highlighting to the court an insufficiency of evidence as to an essential element of the nonmovant's claim.  See id.  Once met, the burden shifts to the nonmoving party to present specific, admissible facts from which a rational trier of fact could find for the nonmovant.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. at 324).  The non-moving party may not rest on his pleadings but must set forth specific facts.  See Applied Genetics Int'l v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Under rule 56(e), only statements made with actual knowledge will support a motion for summary judgment; the court must disregard statements of mere belief.  See Tavery v. United States, 32 F.3d 1423, 1427 n. 4 (10th Cir. 1994) (citations omitted).

For the purposes of summary judgment, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  If "the evidence, interpreted favorably to the plaintiff, could persuade a reasonable jury that the employer had discriminated against the plaintiff," the court should deny summary judgment.  MacDonald v. Eastern Wyoming Mental Health Ctr., 941 F.2d 1115, 1121 (10th Cir. 1991) (quoting Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1570 (7th Cir. 1989)).

The court should, however, grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.P. 56(c).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  A "genuine" factual dispute requires the non-moving party to show more than a mere scintilla of evidence to overcome a motion for summary judgment.  Id. at 252.

The court may grant summary judgment if the non-moving party's evidence

is merely colorable or is not significantly probative.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rest on ignorance of the facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d 977, 984-85 (D.N.M. 2004) (Browning, J.).  When, as here, both parties have moved for summary judgment, the Court is authorized "to assume that there is no evidence which needs to be considered other than that which has been filed by the parties."  Harrison W. Corp. v. Gulf Oil Co., 662 F.2d 690, 692 (10th Cir. 1981).

## ANALYSIS

## I.    THE AIR FORCE IS NOT AN INDISPENSABLE PARTY.

As it did in the first suit, APS moves for dismissal on the grounds that the Air Force is an unjoined but indispensable party to this suit.  See Fed. R. Civ. Pro. 19.

"The question of whether an absent party is necessary and/or indispensable is resolved by applying Rule 19 of the Federal Rules of Civil Procedure."  Sac and Fox Nation of Missouri v. Norton, 240 F.3d 1250, 1258 (10th Cir. 2001) (quoting Davis, 192 F.3d at 957).  Rule 19 provides a three-step process for determining whether an action should be dismissed for failure to join a purportedly indispensable party.  United States v. Bowen, 172 F.3d 682, 688 (9th Cir. 1999).  First, the court must determine whether the absent person is "necessary."  A person is necessary if:

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a); <u>Bowen</u>, 172 F.3d at 688.

<u>Citizen Potawatomi Nation v. Norton</u> , 248 F.3d 993, 997 (10th Cir. 2001).  APS claims that the Air Force is indispensable because the Air Force, and not APS, decertified Trujillo, and the decertification had the effect of disqualifying Trujillo from further employment with APS.  APS asserts that it will be harmed and prejudiced, because failure to join the Air Force will expose it "to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations" under rule 19 based on its conjecture that "jurors would be unable to apportion any liability for Plaintiff's termination between APS and the Air Force, necessarily requiring APS to incur the full amount of any damage award for which the Air Force or its officers are deemed liable."   Defendants' Motion for Summary Judgment at 3-4.  This statement is apparently based on the fact that APS and the Air Force shared in paying Trujillo's salary.

When two entities are alleged each to have liability for an intentional tort, a plaintiff may generally sue both parties or only one party.  See <u>Resolution Trust Corp. v. Stone</u>, 998 F.2d 1534, 1549-50 (10th Cir. 1993) (citing " Advisory Committee Note to the Amended Rule (noting that Rule 19 does not vary the 'settled authorities' holding that a joint tortfeasor is merely a permissive party whose joinder is governed by Rule 20 (Permissive Joinder of Parties)); Charles A. Wright, et al., 7 FEDERAL PRACTICE AND PROCEDURE § 1622 at 342 (2d ed. 1986).").  If APS employees, acting for APS or aided by that agency relationship, intentionally and wrongfully caused Trujillo's decertification by submitting false information to the Air Force, APS would be liable for backpay under Title VII notwithstanding that the Air Force paid part of Trujillo's salary.  See <u>Albemarle Paper Co v. Moody</u>., 422 U.S. 405, 440 (1975) (Marshall, J., concurring) (explaining that backpay under Title VII is generally computed by determining the amount of compensation lost as a direct result of

16

the employer's discriminatory action).  APS has cited no authority for its proposition that damages for back pay in a Title VII case may be apportioned among alleged intentional tortfeasors.

Further, nonparties are not "indispensable" merely because they cannot be joined in a civil suit. Cf. Resolution Trust Corp. v. Stone, 998 F.2d at 1549 (holding that nonparty in bankruptcy was not indispensable merely because it could not be joined in a civil suit).  APS has named the AFJROTC officers involved in Trujillo's decertification as witnesses, and could depose them to determine their reasons for decertifying Trujillo, so the Air Force's absence as a party will not procedurally prejudice APS.  Complete relief could be afforded Trujillo for any civil rights violations APS agents acting for APS may have committed, even in the Air Force's absence as a party.  In short, APS has not demonstrated that it is so situated that the disposition of the action in the Air Force's absence as a party may, as a practical matter, impair or impede APS' ability to protect that interest or leave it "subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."  Fed. R. Civ. P. 19(a).  The Air Force is not a necessary and indispensable party.

APS' argument, made in its reply brief, that Trujillo should be bound by prior representations to this Court in 02cv1146 that "any claim for wrongful termination would be inappropriate for decision because the Air Force – the party that decertified him as an AFJROTC instructor – was not a party to the litigation," see Defendants'. Reply to Plaintiff's Response at 2 (Doc. 59)[1], is not

---

[1]  The footnote APS cites for authority states:

To the extent that Trujillo's briefing alleges his decertification or termination as an adverse action, Trujillo has agreed that any claim for wrongful termination is inappropriate for this case because the Air Force the party which decertified Trujillo resulting in his termination is not a party to this litigation.  See April 8, 2005 at 22:10-24.  Based upon Trujillo's representation that any claim[s] based on

supported in the record and misinterprets the meaning of the first sentence of the footnote APS cites as authority for its assertion.

APS moved in 02cv1146 for dismissal based on Trujillo's failure to join the Air Force as a defendant. At a hearing held on the motion on January 9, 2004, after the Court informed APS that it had difficulty in seeing how the Air Force could be a necessary and indispensable party under Rule 19, the following colloquoy took place between the Court and Trujillo's former counsel:

> Counsel:  . . . [W]e do stipulate that this is not the wrongful termination part of Mr. Trujillo's case. And it's not because it could not be at the time of filing . . . . It could not have been a wrongful termination case at least under Title VII at the time of filing. Not against APS and not against the United States Air Force. It was a legal impossibility at that time because Mr. Trujillo did not have right to sue letters against those entities.
>
> . . . .
>
> Court:    Do you agree that the Air Force cannot be sued under [§] 1983?
>
> Counsel:  Agreed, Your Honor.
>
> Court:    And you agree that *in this case* you could not have joined the Air Force?
>
> Counsel:  Agreed also.
>
> . . . .
>
> Court:    If we're stipulating that wrongful termination is not part of the case, can the Court assume that I will not see any argument that in this case today that wrongful termination is an adverse action . . . for purposes

_____

decertification or wrongful termination are not part of this case, the Court denied the Defendants' motion to dismiss for failure to join an indispensable party, i.e., the Air Force. See id. at 26:7-22. Accordingly, because Trujillo does not address wrongful termination in this motion, the Court will not recite facts relating to his discharge.

Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d at 1025 n.5.

18

of Title VII . . . ?

Counsel: . . . The termination . . . itself and the damages flowing from termination . . . Those belong in the subsequently filed case.

Court: And not in this case.

Counsel: Not in this one, sir.

. . . .

Court: And in this case, what I'm going to be hearing today and what you're complaining about . . are solely committed to these [APS] defendants, the hostile environment complaints, that's all you're complaining about here?  Nothing that the Air Force did, is that correct?

Counsel: There are certain communications to the Air Force that fairly fall within the ambit of this case, but they are communications by these defendants, and we feel that they are fairly charged here.  These are all matters that occurred before Mr. Trujillo was decertified and then terminated from his employment, but we think we've made a fair record in the other motions and the facts underlying those situations might be best addressed in those other motions.

. . . .

Counsel: . . . APS' position has been, well, we didn't really fire you.  We had no choice because the Air Force decertified you, yet the record indicates that the APS defendants played a very significant role, in fact made all the difference in the world in that decertification process.

. . . .

Court: The Court's going to deny the motion [to dismiss for failure to join the Air Force as a necessary and indispensable party].  I think that... the actions that are being alleged in this case are solely being made against these defendants, largely a hostile environment.  I think that the plaintiff has taken the termination off the table as an actionable adverse action, since the action leading to the termination was committed by a nonparty, the termination occurred because of the decertification by the Air Force, and the Air Force is not a party.  So I think that everyone agrees that that is better addressed in another case and it's not before me today.

Transcript in 02cv1146 of January 9, 2004, hearing at 21-26.  Thus, the reason Trujillo stipulated that

he could not have brought his claims associated with his termination in the first suit was not because he had not joined the Air Force as a party but because, at that time, those claims were not administratively exhausted and they could not be brought against *any* party.  The Court concludes that Trujillo did not concede that he could not bring his Title VII claims against APS without joining the Air Force as a party to the litigation.

## II.   APS HAS NOT ESTABLISHED ITS ENTITLEMENT TO SUMMARY JUDGMENT.

In its motion for summary judgment and its response to Trujillo's motion for summary judgment, APS characterizes Trujillo's second federal complaint as one alleging *only* wrongful termination.  See Defendants' Motion for Summary Judgment at 2; Defendants' Response at 15.  A plaintiff may establish a prima facie case of wrongful termination by showing sufficient evidence that: "(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge."  Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1165 (10th Cir. 2000)(internal quotation marks and brackets deleted).  APS asserts that Trujillo cannot establish a prima facie case of wrongful termination because, after the Air Force decertified him as an AFJROTC instructor, Trujillo was no longer qualified for his position.

Trujillo conceded in his first complaint that the decertification "had the effect of disqualifying [him] from further employment with the Albuquerque Public Schools."  Complaint in 02cv1146, ¶ 65.  If Trujillo's cause of action was, in fact, only for wrongful termination, under Munoz v. St. Mary-Corwin Hospital, he might not be able to satisfy his burden to establish a prima facie case, because he was no longer qualified to teach.  Trujillo's claim against APS, however, is for alleged retaliation by APS' agents that resulted in his decertification and culminated in his termination, see Amended Complaint at 14, ¶ 61, so summary judgment is not appropriate on the theory that Trujillo

could not establish a prima facie case of wrongful termination.

In the alternative, APS presents the same argument in a different way. APS argues that it offered a legitimate, non-discriminatory reason for Trujillo's termination – that his decertification compelled termination – and that Trujillo has presented no evidence to establish pretext. Again, however, APS focuses on only the termination as the adverse action of which Trujillo complains, and Trujillo complains of APS' agents giving the Air Force false and derogatory information that caused his decertification as the adverse action. Because APS has not addressed in its summary judgment motion Trujillo's claims for retaliation based on his allegations that APS agents gave the Air Force false and derogatory information that caused his decertification, summary judgment is not appropriate. See O'Toole v. Northrop Grumman Corp., 305 F.3d 1222, 1227 (10th Cir. 2002)(noting that "Rule 56 provides for summary judgment motions on particular issues or claims, and it is unquestionable that a non-moving party is not required to establish the existence of genuine issues of material fact for trial on matters not addressed by the summary judgment motion").

## III.    TRUJILLO HAS NOT ESTABLISHED A RIGHT TO SUMMARY JUDGMENT.

Trujillo asserts entitlement to summary judgment on his Title VII claims based on his allegations that APS agents supplied false and derogatory information to the Air Force that wrongfully caused his decertification.

> To establish a prima facie Title VII retaliation claim, the plaintiff must show: (1) he or she was engaged in opposition to Title VII discrimination; (2) he or she was subjected to adverse employment action subsequent to the protected activity; and (3) there is a causal connection between the protected activity and the adverse employment action.

Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1262-63 (10th Cir. 1998). The "plaintiff must prove that the defendant's action was intentionally retaliatory." Id. at 1263. An "employer can only

be held liable for co-workers' retaliatory [actions] where its supervisory or management personnel

either (1) orchestrate the [actions] or (2) know about the [retaliatory behavior] and acquiesce in it in

such a manner as to condone and encourage the co-workers' actions." Id. at 1265.   Thus,

> [f]or purposes of Title VII, the term "employer" includes not only any "person engaged
> in an industry affecting commerce" but "any agent of such a person." 42 U.S.C. §
> 2000e(b).  Although that language "surely evinces an intent to place some limits on the
> acts of employees for which employers are to be held responsible," Meritor Sav. Bank,
> FSB v. Vinson, 477 U.S. 57, 72 . . . (1986), employers may be vicariously liable for
> the actions of their employees--even intentional torts outside the scope of their
> employment--if the employee "'was aided in accomplishing the tort by the existence
> of the agency relation,'" Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 758 . . .
> (1998) (quoting Restatement (Second) of Agency § 219(2)(d) (1958) [hereinafter
> Restatement] ). . . . The "aided by the agency relation" standard applies even more
> clearly to subordinate bias claims, such as "cat's paw" or "rubber stamp" claims,
> because the allegedly biased subordinate accomplishes his discriminatory goals by
> misusing the authority granted to him by the employer--for example, the authority to
> monitor performance, report disciplinary infractions, and recommend employment
> actions.  See Restatement § 219(2) cmt. e (explaining that the "aided by the agency
> relation" standard applies in situations where "the servant may be able to cause harm
> because of his position") . . . .

E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d 476, 485-86 (10th Cir. 2006),

petition for cert. filed, 75 U.S.L.W. 3106 (U.S. Sept. 5, 2006).  Negative references made by a

supervisor accused of discrimination in an EEOC complaint to a prospective employer may be an

adverse employment action that will support a claim of Title VII retaliation against the former

employer.  See Hillig v. Rumsfeld, 381 F.3d 1028, 1033 (10th Cir. 2004) (holding that, while an

"employer's conduct [must] be materially adverse to the employee's job status," "a plaintiff [may]

show materiality other than by showing a tangible employment action") (internal quotation marks,

brackets, and italics omitted).

     Further, when an employee claims that his employer through its agents retaliated against him

for protected activity, the plaintiff must show that his activity was "a motivating factor" in the

detrimental employment decision.  <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977); <u>Bullington v. United Air Lines, Inc.</u>, 186 F.3d 1301, 1320- 21 (10th Cir. 1999).  If the plaintiff meets this burden, the employer may avoid liability by showing by a preponderance of evidence that it would have done the same thing even in the absence of the protected conduct.  <u>See</u> <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. at 287.

A causal connection or retaliatory motive may be shown by circumstantial evidence, such as protected conduct closely followed by adverse action.  <u>See</u> <u>Candelaria v. EG & G Energy Measurements, Inc.</u>, 33 F.3d 1259, 1261-62 (10th Cir. 1994) (noting that a retaliatory motive can be inferred from fact that adverse employment action follows charges against employer).  But, "[u]nless there is a very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."  <u>O'Neal v. Ferguson Constr. Co.</u>, 237 F.3d 1248, 1253 (10th Cir. 2001)(noting that a one and one-half month period between protected activity and adverse action may, by itself, establish causation, but that courts have held that a three-month period is insufficient).

Based on the analysis presented in <u>Hillig v. Rumsfeld</u>, Trujillo asserts that Mayerstein's, Griego's, and Williams' presentation of false and negative information to the Air Force so that he would be decertified after he had filed his EEOC claims is the adverse employment action that proves his claim of Title VII retaliation against APS as a matter of law.  <u>See</u> Plaintiff's Motion for Summary Judgment at 1.

Specifically, Trujillo asserts that:  (i) Mayerstein falsely accused him of not performing, gave him the March 20 and April 3 counseling memoranda, and sent the "false negative information" to the Air Force certification officer, <u>see</u> <u>id.</u> at 4, ¶¶ 11, 12;  (ii) Mayerstein stated, after Trujillo filed his

EEOC complaint and Mayerstein discussed it with Griego and Lynn, that AFJROTC Deputy Director Doyle told Mayerstein that Headquarters "was squarely in my corner" and that he "felt it was time for CMSgt Trujillo to go" on April 8, id. at 5, ¶ 14 & Exhibit 8; (iii) Mayerstein and Griego gave the national AFJROTC headquarters an overall unsatisfactory military evaluation of him that was false, id. ¶ 15; and (iv) this "false" evaluation, together with Barbara Lynn's June 11 OEOS report, in which she recommended that APS terminate Trujillo and Mayerstein because they jointly had created a hostile educational environment at VHS, and which Williams gave to Doyle three days before Trujillo was decertified, resulted in his decertification, see id. at 7, ¶ 24; id. at 8, ¶ 27.

APS responds that Trujillo's allegations are irrelevant to his claim for wrongful termination, asserting that it is undisputed that Trujillo's decertification was *not* based upon an unsatisfactory evaluation. APS contends instead that Trujillo was decertified "because his conduct failed to meet the standards expected of an Air Force Officer and because Trujillo caused discredit and embarrassment to the Air Force and AFJROTC program." Defendants' Response at 4. The evidence APS presented does not conclusively establish that the discrediting, embarrassing, and substandard conduct the AFJROTC found Trujillo to have committed was not based on information contained in Mayerstein's many memoranda, letters, and evaluations or in Lynn's report, but it does create a genuine issue of material fact whether the information Mayerstein and Williams gave the AFJROTC headquarters caused Trujillo's decertification, which precludes summary judgment in Trujillo's favor.    APS also asserts that Trujillo has not shown that anything was sent to Air Force certification officer JoAlice Talley. The record belies that contention because it contains evidence that Mayerstein sent his memoranda, evaluations, and e-mails to various officers at the AFJROTC headquarters, including Talley.

APS further contends that any claims that APS' agents retaliated against Trujillo by submitting allegedly false information to the Air Force to cause his decertification has "already been dealt with in [the first federal case]." Id. at 15. Again, that contention is not accurate. The parties and the Court emphasized in the previous case that any claims based on Trujillo's decertification and resultant termination were the subject only of the second federal complaint. See Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 377 F. Supp. 2d at 1025 n.5

Finally, APS asserts that Trujillo cannot show a causal connection between his *termination* and his protected activity or that APS' reason for *terminating* him was pretextual. See Defendants' Response at 17-19. As mentioned above, however, the question is whether Trujillo can show a causal connection between the adverse action of sending the Air Force false and derogatory information and Trujillo's decertification.

Nevertheless, summary judgment in Trujillo's favor against APS on his allegations involving various APS employees cannot be granted unless Trujillo has established that he is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. To fully dispose of Trujillo's motion and to narrow the issues at trial, the Court must still determine whether Trujillo has satisfied his burden based on the allegations and evidence as to each employee and adverse action that he has presented in his summary judgment motion.

## A.   GRIEGO DID NOT SEND NEGATIVE EVALUATIONS TO THE AFJROTC HEADQUARTERS.

The documentary evidence that Trujillo submits contradicts his assertion that Griego gave Trujillo an unsatisfactory evaluation. The record shows that Griego refused to indorse Mayerstein's evaluation, and that Griego gave Trujillo a satisfactory teacher's evaluation and recommended his re-

employment after Trujillo filed his April EEOC complaint, notwithstanding Mayerstein's opinions about Trujillo's performance.  Griego also informed AFJROTC headquarters, after Trujillo filed his EEOC complaint, that Griego believed Mayerstein's rating of Trujillo was based on a personality conflict.  Finally, Griego was diligent in requesting and obtaining an independent investigation by the OEOS office, including interviews of ROTC cadets, after receiving the EEOC complaint, which was the act that Trujillo insisted Griego should undertake.  Trujillo presents no evidence that Griego, who was Trujillo's ultimate supervisor, took any adverse employment actions against Trujillo after Trujillo filed his EEOC complaints.  Trujillo is not entitled to summary judgment against APS based on any actions Griego took.

> **B.    THERE IS NO EVIDENCE THAT WILLIAMS HAD A DISCRIMINATORY MOTIVE IN GIVING THE AFJROTC DEPUTY DIRECTOR A COPY OF THE OEOS REPORT OR THAT HIS REASON FOR GIVING IT WAS PRETEXTUAL.**

"A plaintiff alleging violations of Title VII must present either direct or indirect evidence sufficient to show intentional discrimination." Munoz v. St. Mary-Corwin Hosp., 221 F.3d at 1166. For retaliatory intent to be attributed to an employer in a case in which the plaintiff alleges retaliation by a supervisor/management by giving false or negative information, the plaintiff must present evidence from which a jury could infer the supervisor had a discriminatory reason for retaliating against him. For example, in Hillig v. Rumsfeld, the plaintiff had previously accused his direct supervisors of discrimination, and the jury found that these supervisors had a retaliatory motive when they later gave the plaintiff a negative employment reference.  See 381 F.3d at 1031.  Here, Trujillo did not file a complaint asserting that Williams previously discriminated against him, and Williams did not prepare the OEOS report that he shared with Doyle.  Trujillo asserts only that a retaliatory intent may be

inferred because of  the  temporal proximity of Williams' August 20 act of turning over the report to Doyle to the filing of Trujillo's discrimination charges against other APS agents the previous April and June.  The Court disagrees that retaliatory intent may be inferred under the circumstances of this case.

Trujillo's documentary evidence establishes that each school offering ROTC training has a responsibility to direct the AFJROTC program at that school; to investigate and evaluate the performance of the AFJROTC instructors there; and to share that information with the national AFJROTC headquarters.  See Plaintiff's Motion for Summary Judgment, Exhibit 13 ¶¶ 3.1, 3.2, 2.3.1. It is undisputed that Doyle requested APS administrators to meet with him to help determine the source of the VHS ROTC unit's very public problems.  It is further undisputed that, instead of relying on Mayerstein's allegations that Trujillo was incompetent and involving students in the disputes between them, APS properly conducted an independent investigation before Williams turned over any reports.  See English v. Colo. Dep't of Corrs., 248 F.3d 1002, 1011 (10th Cir. 2001) (noting that, to recover under a theory that an employer should be held liable for taking adverse action based upon allegations or recommendations of another employee with supervisory authority but no authority to terminate, the "plaintiff must show that the decisionmaker followed the biased recommendation of a subordinate without independently investigating the complaint against the employee") (internal quotation marks omitted).

It is undisputed that APS had disciplined Mayerstein more harshly than Trujillo by giving Mayerstein a formal letter of reprimand and forwarding a copy of it to AFROTC headquarters.  Lynn's report noted APS' concerns about Mayerstein's comments about Trujillo and contained negative recommendations about Mayerstein even though Mayerstein had not filed an EEOC complaint.  While Doyle may have accepted the ROTC cadets' and Lynn's opinions that both Trujillo and Mayerstein

27

had contributed to the undisputedly hostile environment in the ROTC department at VHS, Trujillo has

not presented any evidence that Trujillo's filing of his EEOC complaints or any other protected activity

triggered or motivated Lynn's conclusions and opinions or Williams' act of turning over the

investigative report.

Trujillo argues that, because he filed his EEOC complaint on April 3 and Lynn recommended

an investigation and wrote her report on June 11, a jury could infer discriminatory motive.  But

preparing the report itself cannot be considered an adverse action or retaliation because, although she

recommended termination, Lynn also suggested re-employment, mentoring, and further evaluation,

and APS followed the latter suggestions notwithstanding Trujillo's April and June EEOC complaints.

Further, Lynn's recommendations for termination were based on her conclusion that both instructors

had created a hostile educational environment and were the same for both employees even though

Mayerstein had not filed an EEOC complaint, so Trujillo cannot allege unequal treatment.  Under these

circumstances, temporal proximity, standing alone, is not sufficient to establish as a matter of law that

Trujillo's protected activity was a substantially motivating factor in Williams' decision to turn over

Lynn's report to Doyle, given APS' independent investigation and its duty to cooperate with the

AFJROTC national headquarters.  See E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles, 450

F.3d at 488 (stating that, "because a plaintiff must demonstrate that the actions of the biased

subordinate caused the employment action, an employer can avoid liability by conducting an

independent investigation of the allegations against an employee").

Similarly, Trujillo has not rebutted Williams' reason for turning over the report – which was

to cooperate with Doyle in determining APS' position on the issue of re-employing both instructors

– and thus has not shown that Williams' behavior was pretext for discrimination.  Trujillo is not

entitled to summary judgment against APS based on any actions Williams took.

### C.   THERE ARE GENUINE ISSUES OF MATERIAL FACT WHETHER MAYERSTEIN'S REPORTS WERE FALSE.

The Court next turns to Mayerstein's actions that Trujillo alleges substantially contributed to Trujillo's decertification and for which he seeks to impose liability upon APS. APS and the AFJROTC shared in paying Mayerstein's salary. Accordingly, Mayerstein had contractual and/or regulatory duties both to APS as an employee and to the national AFJROTC as an instructor. Mayerstein was certified by the AFJROTC and was obligated to follow the agency's mandates. See Defendants' Motion for Summary Judgment, Exhibit H at 1 ("AFOATS INSTRUCTION 36-2004" noting that "compliance with this publication is mandatory"); Plaintiff's Response, Exhibit 13 ¶ 3.4 ("AFOATS INSTRUCTION 36-2004" providing that "[t]he SASI is the senior instructor and reports directly to the principle . . . of the school.  All other instructors report directly to the SASI. Instructors must meet and maintain school and Air Force requirements and standards.") "Monitoring and evaluating is accomplished through appraisal of instructors by the SASI, school officials, AFOATS representatives during staff visits, analysis of staff visit reports, and the overall performance of the unit." Id. ¶ 3.5. "The principal . . . evaluates the SASI; the superintendent indorses the ER [Evaluation Report]." Id. ¶ 3.6.2.1. "The SASI evaluates ASIs in the unit, and the principal . . . indorses the ERs rendered by the SASI." Id. 3.6.2.2. The ERs are then mandatorily forwarded to headquarters after the instructor who has been evaluated "indicates concurrence or nonconcurrence and signs and dates the report." Id. ¶ 3.6.2.3 & ¶ 3.6.3.

APS did not give Mayerstein, a new employee, supervisory status over Trujillo, who had worked at VHS for eleven years. Rather, Mayerstein had that status because of his qualifications for

the SASI position under AFJROTC regulations.  Mayerstein admits that he began "observ[ing] and record[ing], for [his] own file, deficiencies in [Trujillo] as early as November 2001," Plaintiff's Response, Exhibit 23, ¶ 9, which coincided with the time period in which Trujillo allegedly openly challenged Mayerstein's certification to teach the honors private pilot's ground school class at VHS and began complaining to Griego about Mayerstein's abuses of students.  As the Court noted in its September 2, 2005, Opinion and Order granting reconsideration and denying summary judgment to Mayerstein on Trujillo's First Amendment claims in the first federal suit, Trujillo swore that, after Mayerstein learned of Lourdes' December 2001 letter informing the Board of Mayerstein's lack of certification, Mayerstein "threatened to have [Trujillo] fired."  02cv1146, Doc. 197 at 9 (slip opinion). Because Mayerstein denies the threat, there is a genuine issue of material fact on the issue of Mayerstein's discriminatory intent.

The formal counseling in March occurred within two months of Lourdes' letter.  The record shows that Mayerstein informed the national headquarters of not only that counseling, but also of the April 3 counseling so that, by April 8, Mayerstein felt assured that headquarters was in "his corner;" asserting that the Deputy Director stated it was time for Trujillo "to go."  Plaintiff's Motion for Summary Judgment, Exhibit 8.  It is undisputed that Mayerstein sent headquarters the unsatisfactory April 15 annual military ER weeks after Trujillo filed his EEOC complaint.  He also sent the derogatory July 15 letter to headquarters that harshly criticized APS' decision to continue Trujillo's employment.

It is undisputed that Mayerstein had no authority to fire Trujillo at APS and that Griego evaluated Trujillo as an APS teacher.  Although, as his co-worker and military supervisor, Mayerstein forcefully recommended that Trujillo not be re-employed, APS refused to take his recommendations.

As Trujillo's military supervisor charged with evaluating him by AFJROTC regulations, however, unless Mayerstein's statements are shown to be false, a jury could find that Mayerstein was performing his job as SASI to evaluate Trujillo's performance and that he did not have a discriminatory motive in reporting Trujillo's conduct to AFJROTC headquarters.  Because Trujillo and Mayerstein deny each other's material allegations, summary judgment is not appropriate in Trujillo's favor.

Further, because Trujillo has not presented evidence that Griego or other APS management had a discriminatory motive, to hold APS liable for Mayerstein's actions as a biased subordinate supervisor on the basis of Trujillo's motion for summary judgment, Trujillo must present uncontroverted evidence that Mayerstein sent the AFJROTC headquarters the derogatory information *while acting as APS' agent.*  See E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 485-86 (noting that "employers may be vicariously liable for the actions of their employees –  even intentional torts outside the scope of their employment –  if the employee was aided in accomplishing the tort by the existence of the agency relation," and "the 'aided by the agency relation' standard applies in situations where the servant may be able to cause harm *because of* his position") (internal quotation marks omitted, italics added).  Because Trujillo has not presented evidence that APS or its management instructed or encouraged Mayerstein to send his comments, military evaluation, or e-mails to AFJROTC headquarters or that he sent derogatory information to headquarters *because of* his agency relationship with APS – as opposed to because of his regulatory duties as an instructor and supervisor for the AFJROTC – Trujillo has not shown entitlement to summary judgment on this issue.

**IT IS ORDERED** that Defendant APS' Motion for Summary Judgment and Trujillo's Motion for Summary Judgment are denied.

31

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Transito Trujillo
Albuquerque, New Mexico

     *Pro Se Plaintiff*

Max J. Madrid
Alex C. Walker
Modrall, Sperling, Roehl, Harris & Sisk
Albuquerque, New Mexico

     *Attorneys for Defendants Board of Education,*
     *Albuquerque Public Schools and Anthony Griego*

Sean Olivas
Richard L. Alvidrez
Keleher & McLeod
Albuquerque, New Mexico

     *Attorneys for Defendant Mark Mayerstein*